1 | P.M. Bessette (Bar No. 127588)
2 | Amber Lee Kelly (Bar No. 117006)
**DEMLER, ARMSTRONG & ROWLAND, LLP**
3 | 101 Montgomery Street, Suite 1800
San Francisco, CA 94104
4 | Telephone:  (415) 949-1900
Facsimile:  (415) 354-8380
5 | Email:      bes@darlaw.com
            alk@darlaw.com
6 |
7 | Attorneys for Defendant
NATIONAL STEEL AND SHIPBUILDING COMPANY
8 |

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 |

| | |
|---|---|
| WILLIAM OLLERTON, an individual, | Case No.: |
| Plaintiff, | Los Angeles County Superior Court Case No. 23STCV00861 |
| v. | **NATIONAL STEEL AND SHIPBUILDING COMPANY'S NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. § 1442(a)(1)** |
| NATIONAL STEEL AND SHIPBUILDING COMPANY; AIR & LIQUID SYSTEMS CORPORATION, a subsidiary of AMPCO-PITTSBURGH CORPORATION, individually and as successor by merger to BUFFALO PUMPS, INC., individually and successor in interest to BUFFALO FORGE COMPANY; AURORA PUMP COMPANY; BLACKMER PUMP COMPANY; BW/IP, INC., individually and as successor in interest to BYRON JACKSON PUMP CO.; CLA-VAL CO., a division of GRISWOLD INDUSTRIES; ELLIOTT COMPANY aka ELLIOTT TURBOMACHINERY CO., INC.; FLOWSERVE US INC., individually | |

1    and as successor in interest to
2    EDWARD VALVE, INC.;
     FMC CORPORATION, individually
3    and as successor in interest to
     NORTHERN PUMP COMPANY f/k/a
4    NORTHERN FIRE APPARATUS
     COMPANY, CHICAGO PUMP
5    COMPANY AND PEERLESS PUMP
6    COMPANY;
7    FOSTER WHEELER, LLC, as
     successor in interest to FOSTER
8    WHEELER CORPORATION and
9    FOSTER WHEELER ENERGY
     CORPORATION;
10   GARDNER DENVER, INC. f/k/a
11   GARDNER DENVER MACHINERY,
     INC.;
12   GENERAL ELECTRIC COMPANY;
13   GOULDS PUMPS, INC.;
     GRINNELL LLC, dba GRINNELL
14   CORPORATION;
15   IMO INDUSTRIES, INC., sued
     individually and as successor-in-interest
16   to DELAVAL STEAM TURBINE
     COMPANY and DELAVAL, INC.;
17   ITT LLC, f/k/a ITT CORPORATION,
18   f/k/a ITT INDUSTRIES, INC.,
     individually and as successor-in-interest
19   to BELL & GOSSETT COMPANY,
20   FOSTER ENGINEERING COMPANY
     and KENNENDY VALVE
21   COMPANY;
22   PARAMOUNT GLOBAL, f/k/a
     VIACOMCBS INC., f/k/a CBS
23   CORPORATION, a Delaware
     corporation, f/k/a VIACOM INC.,
24   successor by merger to CBS
25   Corporation, a Pennsylvania
     corporation, f/k/a WESTINGHOUSE
26   ELECTRIC CORPORATION;
27   REDCO CORPORATION, f/k/a
     CRANE CO.;
28

2

SYD CARPENTER, MARINE CONTRACTOR, INC.;
WARREN PUMPS, LLC, f/k/a
WARREN PUMPS, INC., individually and as successor in interest to
QUIMBY PUMP COMPANY;
and DOES 1through 400, inclusive;

Defendants.

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant NATIONAL STEEL AND SHIPBUILDING COMPANY, (hereinafter "NASSCO"), hereby files this notice of removal of the above-entitled action from the Los Angeles County Superior Court to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1442(a)(1).  In support of this joinder of notice of removal, NASSCO respectfully states the following:

## I.   **STATE COURT PROCEEDINGS**

1.     On January 13, 2023, Plaintiff William Ollerton filed his personal injury Complaint commencing the action entitled *William C. Ollerton v. National Steel and Shipbuilding Company, et al.*, Los Angeles County Superior Court Case No. 23STCV00861, against NASSCO and many other defendants.  (*See* Plaintiff's Complaint, a true and correct copy is attached to the Declaration of P.M. Bessette (hereinafter "Bessette Decl." as **Exhibit 1**.)

2.     NASSCO was served with the Summons and Complaint by hand delivery on January 20, 2023.

3.     The Complaint alleges that Plaintiff William Ollerton has developed mesothelioma as a result of exposure to asbestos from several Defendants' asbestos containing products. (Bessette Decl., **Exhibit 1**, Plaintiff's Complaint, ¶ 9, 7:18-25.)

## Nature of Case

3.      Plaintiff William Ollerton alleges that he was exposed to asbestos-containing products over the course of his service in the United States Navy aboard the *USS Duluth (LPD-6)* as a Machinist Mate between 1976 and 1978.

The Complaint states:

7. Plaintiff WILLIAM OLLERTON was exposed to asbestos while serving in the US Navy as a machinist mate from approximately 1976 to 1978 aboard the ships, including but not limited to, USS Deluth (LPD - 6) *(sic)*, as well as the National Steel and Shipbuilding facility in San Diego, CA, who at various locations, including within the State of California, used, handled or was otherwise exposed to asbestos, asbestos containing products and/or products designed to be used in association with asbestos products of, and/or products that created an asbestos hazard, and/or safety equipment intended to block the entry of asbestos fibers, and/or by virtue of the creation of asbestos dust and failure to protect from asbestos dust, and/or on or about the premises of and by, defendants and DOES 1 through 400, and each of them, inclusive; including: NATIONAL STEEL AND SHIPBUILDING COMPANY (for negligent exposure to asbestos dust)

(Bessette Decl., **Exhibit 1**, Plaintiff's Complaint, ¶ 7, 5710-20.)

The Preliminary Fact Sheet to the Complaint describes Mr. Ollerton's NASSCO-related exposures as follows:

Defendant: NATIONAL STEEL AND SHIPBUILDING COMPANY

Product at Issue: for negligent exposure to asbestos dust

Date(s) of Exposure: 1976-1978

Employer: US Navy

Location of Exposure: USS Deluth (LPD 6);

National Steel and
Shipbuilding Facility
in San Diego, CA

Type of Exposure (Direct Occupational, Para-Occupational, or Non-Occupational):  Direct Occupational

(Bessette Decl., **Exhibit 1**, Plaintiffs' Complaint, Preliminary Fact Sheet, Page 3.)

Plaintiffs' Complaint asserts causes of action for, Negligence, Strict Products Liability, and Premises Owner/Contractor Liability, with a prayer for punitive damages.  Plaintiff generally alleges that he experienced exposure to asbestos during his service in the United States Navy as a Machinist Mate aboard the *USS Duluth (LPD-6)* between 1976 and 1978.  His exposures allegedly arise from work with and around products that were manufactured by numerous defendants during the course of his naval employment.  As to government contractor NASSCO, Mr. Ollerton specifically alleges exposure aboard the *USS Duluth (LPD-6)* while it was undergoing repairs in San Diego, CA at NASSCO.

### Jurisdiction, Venue and Intradistrict Assignment

4.      Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below under Grounds for Removal.

5.      Venue is proper in Central District of California as the state court action, which is subject to this removal petition, was filed in the Superior Court of California for the County of Los Angeles where it was alleged that all parties are subject to personal jurisdiction.

6.      Furthermore, § 1442 authorizes such a removal without the consent of any other defendant.  *See Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1314-1315 (9th Cir. 1981) ("federal officer . . . can remove without other defendants joining the petition, and the entire case is removed to the federal court.").

## II.   GROUNDS FOR REMOVAL

7.      This Notice of Removal has been timely filed, in accordance with U.S.C. § 1446(b), within thirty days of the date that NASSCO was served with Plaintiff's Complaint.

8.      This action is being removed on federal officer grounds pursuant to 28 U.S.C. § 1442(a). The basis for removal is that this action involves a person (NASSCO) who, in relation to the claims being stated against it as a designer, manufacturer and maintainer of military equipment, acted under the authority, direction, and control of an officer or agency of the United States and who can state a colorable federal law-based "government contractor" defense to those claims.

9.      Plaintiff's Complaint makes it clear that at least some of Plaintiff William Ollerton's alleged asbestos exposure resulted from his work aboard a U.S. Navy ship undergoing repairs at NASSCO.  (Bessette Decl. **Exhibit 1**, supra at Exhibit A, 30:12-13.)  Research reveals that NASSCO performed repair/maintenance activities aboard the *USS Duluth (LPD-6)* between 1976 and 1978 for the U.S. Navy.  (Bessett Decl., ¶ 2.)  At all relevant times, including during Mr. Ollerton's alleged work aboard a military vessel, any and all ships constructed and/or repaired by NASSCO for the United States military were designed, manufactured and/or repaired in accordance with detailed specifications approved by the United States military and under the direction, supervision, control, orders, and directives of a federal officer acting under color of federal office.

10.     A case is removable under U.S.C. § 1442(a) "when the plaintiff discloses sufficient facts for federal officer removal…" *Durham v. Lockheed Martin Corp*., 445 F. 3d 1247, 1253 (9th Cir. 2006).  The facts in *Durham* are analogous to those in the case at bar.  The plaintiff's complaint in *Durham* named Lockheed as a defendant and alleged asbestos exposure at Air Force facilities at

which the plaintiff worked but did not specify which Lockheed products allegedly exposed him to asbestos. *Id*. at 1249. Lockheed removed the case to federal court within 30 days after receiving discovery responses disclosing that the plaintiff was exposed to asbestos while working on its military aircraft. *Id.* at 1249. The plaintiff filed a motion to remand, which was granted by the district court. *Id*. at 1249-1250. The plaintiff did not dispute, and the district court did not deny, that the case was removable under 28 U.S.C. §1442(a). However, the District Court found that the case was not timely removed, and remanded the case back to state court. *See id.* at 1249-1250. The Ninth Circuit reversed the District Court's ruling, holding that Lockheed properly and timely removed based on federal officer jurisdiction. *Id.* at 1254. The Ninth Circuit, recognizing "a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal," explained that a case is properly removable under federal officer jurisdiction once "the plaintiff discloses sufficient facts for federal officer removal…." *Durham*, 445 F.3d at 1253; *see also Leite v. Crane Co*., 749 F. 3d 1117, 1122 (9th Cir. 2014) (explaining that a case is properly removable if facts exist supporting removal jurisdiction).

11.     Accordingly, as in *Durham*, Plaintiff's Complaint here clearly alleges that William Ollerton's exposure to asbestos resulted from his contact with asbestos-containing products aboard a ship, the *USS Duluth (LPD-6)*, undergoing construction and/or repairs at NASSCO during the course of his naval service and therefore this matter is ripe for removal pursuant to 28 U.S.C. §1442(a).

12.     NASSCO offers at this time the following statement and citations to authority in satisfaction of its obligations under 28 U.S.C. § 1446 to provide a short and plain statement of the legal and factual basis for its removal. However, if Plaintiff files a motion to remand this case, NASSCO respectfully requests an

1  opportunity to respond more fully in writing with additional factual and legal

2  support, but offers the following authorities at this time:

3      Removal pursuant to 28 U.S.C. § 1442(a)(l) is appropriate where the

4  moving party can (1) demonstrate that it acted under the direction of a federal

5  officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3)

6  demonstrate a causal nexus between plaintiff's claims and acts it performed under

7  color of federal office. *Mesa v. California*, 489 U.S. 121, 124-125, 129-131, 134-

8  135 (1989). As was recognized by the U.S. District Court for the Eastern District

9  of Pennsylvania (the "home court" for the Asbestos MDL), NASSCO may

10  properly remove this case to federal court if it establishes "colorable" right to

11  assert a "federal" defense to Plaintiff's claims. *See Hagen v. Benjamin Foster*

12  *Co.*, 739 F.Supp.2d 770 (E.D.Pa. Sept. 24, 2010). Here, NASSCO can satisfy all

13  three of the *Mesa* elements, as it has a federal defense to this action, i.e., the

14  "government contractor" defense, which would provide immunity to NASSCO for

15  liability arising from injury caused to Plaintiff by any exposure to asbestos while

16  working aboard a Navy vessel undergoing construction and/or repairs at

17  NASSCO. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988).

18      13.    Removal on the basis of "federal officer" jurisdiction is not a new

19  concept, and federal courts across the country have approved its use by

20  government contractors. For example, in *Isaacson v. Dow Chemical Company*,

21  304 F.Supp.2d 442 (E.D.N.Y. 2004), the plaintiff originally sued the manufacturer

22  of Agent Orange in New Jersey State Court. Defendants removed to federal court

23  asserting, among other things, federal jurisdiction under the All Writs Act.

24  *Isaacson, supra*, 304 F.Supp. at 445. After a lengthy procedural history, the

25  *Issacson* court ultimately held that the removal had been proper under the "federal

26  officer" removal statute, due to defendants' status as government contractors.

27  *Isaacson, supra,* 304 F.Supp. at 445.

28      14.    In reaching its conclusion, the *Isaacson* court discussed in detail the

three elements necessary for removal under this statute.  First, a defendant must demonstrate that it is a "person" within the meaning of the statute.  *Isaacson, supra*, 304 F.Supp. at 446.  Second, the defendant must establish that the suit is "for any act under color of federal office," i.e., there is a causal connection between the charged conduct and asserted official authority.  *Id.* [citations omitted].  Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office.  *Id.*  Third, a defendant must raise a colorable claim to a federal law defense. *Id.*  As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense.  *Isaacson, supra*, 304 F. Supp. at 449.

15.     The first element as to whether NASSCO is a "person" under the "federal officer" removal statute cannot be in dispute because the definition of "person" under the statute includes a corporation.  *See Isaacson, supra*, 304 F.Supp. at 446; *see also Hagen, supra*, 739 F.Supp.2d at 776.

16.     The second and third elements require a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims, and that a "colorable" federal defense has been established that would apply to the plaintiff's claims.  *Isaacson, supra*, 304 F.Supp. at 447; *see also Hagen, supra*, 739 F.Supp.2d at 776.  To show that a defendant acted "under the direction of a federal officer," a substantial degree of direct and detailed federal control over defendant's work must be shown.  *Isaacson, supra*, 304 F.Supp. at 447; *see also Hagen, supra*, 739 F.Supp.2d at 776, 784-785.

17.     This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning."  *Kerstetter v. Pacific Scientific Co*., 210 F.3d 431, 438 (5th Cir.) cert. denied 531 U.S. 919 (2000).  The government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning

reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government.  *Kerstetter, supra*, 210 F.3d at 438.

18.    As stressed in *Kerstetter*, "[t]he government need not prepare the specifications to be considered to have approved them."  *Kerstetter, supra*, 210 F.3d at 435.  The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. (*Id.*)  While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government." (*Id.*)  In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." (*Id.*)  Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question.  *Kerstetter, supra*, 210 F.3d at 438.  Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." (*Id.*)

19.    Other courts have recognized that "[t]he selection of the appropriate design for military equipment . . . is assuredly a discretionary function . . . . It often involves not merely engineering analysis but judgment as to the balancing of many technical, military and even social considerations, including specifically the trade-

1   off between greater safety and greater combat effectiveness" *Sundstrom v.*

2   *McDonnell Douglas Corp.*, 816 F.Supp. 587, 597 (N.D. Cal. 1993).

3       20.   As a result, numerous courts have upheld removal because defendants

4   were sued as a result of constructing products pursuant to military specifications.

5   (*See, e.g.*, *Reaser v. Allis Chambers Corp., et al.*, CVOS-1296-SVW(SSx) (C.D.

6   Cal. June 23, 2008) [evidence provided by defendants General Electric and Viad

7   Corporation established that the Navy exercised strict control over defendants'

8   ability to place warnings on their products and Defendants met the elements of the

9   government contractor defense]; *O'Connell v. Foster Wheeler Energy Corp., et al.*,

10   2008 WL 1722079 (D. Mass. Apr. 7, 2008); *Wright v. Foster Wheeler, et al.*, C07-

11   05403 MJJ (N.D. Cal. Feb. 21, 2008) [removal was proper as Foster Wheeler

12   provided sufficient evidence supporting a finding that the Navy had direct and

13   detailed control over its ability to place warnings on its equipment manufactured

14   for the Navy and according to precise Navy specifications]; *Nelson v. Foster*

15   *Wheeler, et al.*, CV07-8338 VBF(RCx)  (C.D. Cal. Feb. 8, 2008) [removal upheld

16   because evidence provided by Foster Wheeler demonstrated that the equipment it

17   manufactured for the Navy were subject to strict control and design specifications];

18   *see also Crocker v. Borden*, 852 F.Supp. 1322 (E.D. La. 1994) [holding that

19   removal was proper for Westinghouse because its marine turbines were

20   manufactured pursuant to Navy specifications]; *Pack v. AC and S, Inc.*, 838

21   F.Supp. 1099 (D. Md. 1993) [holding that removal was proper for Westinghouse

22   because the government had extensive control over the manufacture of turbines,

23   even specifying the type of asbestos cloth].)

24       21.   Plaintiff may argue that, even if NASSCO can meet the requirements

25   of the "government contractor" defense, it could not successfully assert the

26   government contractor defense because no conflict existed between the

27   Government's specifications and instructions and the state law claim.  Federal

28   courts have rejected this argument, and have ruled that a conflict between federal

policy and state law exists if there is evidence that the Government was involved in the decision to give, or not to give, a warning.  *In re Air Disaster at Ramstein Air Base, Germany*, on 8/29/90, 81 F.3d 570, 576 (5th Cir. 1996), opinion amended on denial of reh'g sub nom. *Perez v. Lockheed Corp*., 88 F.3d 340 (5th Cir. 1996).) Further, the construction and repair of Navy vessels is governed by detailed government contracts which do not allow for the government's subjugation to state law.

22.     As the Court noted in *Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998), at 660-661:

> Contrary to plaintiffs' argument, the government contractor defense is not narrowly confined to those situations where a particular military specification directly conflicts with state law. *Instead, the defense applies whenever state tort liability would otherwise restrict the government's ability to exercise its discretion in military matters. This includes those situations in which the government makes the informed decision not to include a specification or require a warning because, in the government's view, one would be unnecessary or problematic.*

> As this court stated in *Tate I*, "[W]hen the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability." 55 F.3d at 1157.  Therefore, once the three conditions of the *Tate I* analysis has been satisfied and government discretion has thus been established, significant conflict exists and the government contractor defense applies.

23.     Notwithstanding the complete lack of discretion granted to NASSCO for its repair to naval ships, any argument by Plaintiff to the effect that federal law must be displaced in favor of state law for a government contractor's repair work aboard a naval ship in navigable waters ignores critical practical and legal realities that exist between the government and the contractors with whom it engages to repair military equipment.  The suggestion that state law might somehow be applied to repair work by contractors aboard Navy ships is especially misguided given the federal government's exclusive sovereign authority under Clauses 11, 12,

13 and 14 of the Constitution to provide and maintain a Navy. State law simply does not and cannot have application to the federal government's operation and maintenance of a Navy. To allow states to regulate the performance of government contracts aboard Navy vessels would give rise to unimaginable conflicts in the ability of the government to engage in the tasks necessary to accomplish national security interests. By way of example, Plaintiff may seek to argue that State worker safety regulations, such as Cal-OSHA, have the authority to regulate conduct at federal installations and aboard federal ships simply because the installation or ship is within the borders of California. This argument is contradicted by the laws and regulations of the United States as it is undisputed that State workplace regulations do not have jurisdiction aboard federal vessels. States are prohibited from exercising jurisdiction aboard Navy ships in navigable waters as the result of clearly established federal guidelines. Specifically, in the context of regulating the handling of asbestos, the Navy has developed as series of standards and regulations for activities aboard ships and has strictly imposed those regulations for work at Naval shipyards and private shipyards, including for work performed by public and private contractors at those facilities. Commencing in the very early 1970s and running throughout the decade, there were programmatic changes that were codified up to the level of the Chief of Naval Operations regarding the control and use of asbestos throughout the Navy. Through NAVSHIP Instruction 5100.26 "Asbestos Exposure Hazards; control of" issued on 9 February 1971, Naval Ship Systems Command established safety requirements applicable to all supervisors and workers engaged in the fabrication, installation and/or removal of asbestos containing insulation. The regulations specifically and strictly prescribed methods for the identification of asbestos materials aboard ships, the isolation of those materials, the work practices associated with asbestos materials – including the use of personal protective equipment, the issuance and posting of warnings associated with such work, as well as protocols for the

removal and disposal of asbestos.  Deviations in these standards by government contractors were not allowed.  NAVSHIP Instruction 5100.26 was released before the promulgation of the Occupational Safety and Health Act ("OSHA") Asbestos standard in June 1972.  Throughout the 1970s, the NAVSHIPS instructions for asbestos handling were neither supplemented nor superseded by the U.S. Department of Labor's OSHA regulations.  In fact, Executive Order 12196 issued by President Carter in 1980 (see Bessette Decl. **Exhibit 2**) clarified that military personnel and uniquely military equipment, systems and operations were expressly excluded from the requirements of OSHA.  Thus, it certainly cannot be claimed that if Federal OSHA standards had no force and effect aboard Navy ships in the 1970s during Plaintiff's service in the Navy, that State OSHA regulations could somehow have been imposed for the same work aboard naval vessels.  Since the 1980s, Navy administrative regulations have made efforts to specifically delineate the jurisdictional limits of Navy regulations, Federal OSHA standards and State OSHA standards for work aboard Navy ships.  The Navy's OPNAVINST 5100.23G, Chapter 11 December 30, 2005 (Bessette Decl., **Exhibit 3**.) specifically sets forth the requirement at section 1103. a. that State Occupational Health and Safety regulators "must **not** be granted access aboard naval ships and service craft or in areas of exclusive federal jurisdiction".  The guideline specifically addresses government contractor work aboard naval ships and reads:

> 1103.   Federal and State Occupational Safety and Health Inspections of Contractor Workplaces Aboard Navy Ships
>
> This section provides guidance and procedures regarding requests by Federal or State OSH officials to inspect or investigate contractor workplaces aboard Navy ships in port or located at associated facilities (e.g., repair operations).
>
> a.   Subject to conditions and exceptions stated below, Navy afloat activities shall permit Federal OSHA compliance officials, to be taken aboard U.S. Navy ships in port to conduct safety and health inspections and investigations of contractor workplaces**. Commanding officers shall not grant State occupational safety and health officials access aboard naval ships and service craft or in areas of exclusive Federal jurisdiction.**

(Emphasis added.)

The Navy's OPNAVINST 5100.19F, dated May 3, 2019 (Bessette Decl., **Exhibit 4**) also specifically sets forth the statement that State Occupational Health and Safety regulators "must not be granted access aboard naval ships and service craft or in areas of exclusive federal jurisdiction."  Appendix A3-A provides a clear illustration of the jurisdictional borders for Federal and State OSH representatives and specifically demonstrates that State OSH representatives have "no jurisdiction over military unique operations or equipment" aboard ships that might be designated as "Contractor Workplaces", "Civilian Workplaces" or "Exclusively Military Workplaces."  The guideline reads in full:

> 7.    <u>Federal and State Occupational Safety and Health (OSH) Inspections of Navy, Civilian, or Contractor Workplace Aboard Navy Ships</u>.  This paragraph provides guidance and procedures regarding requests by Federal or State OSH officials to inspect or investigate Navy civilian or contractor workplaces on board Navy ships in port or located at associated facilities (e.g., industrial activities).
>
> a.    Subject to the conditions and exceptions stated below, Navy afloat activities are advised that permission is granted for Federal OSHA compliance officials to be taken aboard U.S. Navy ships in port to conduct safety and health inspections and investigation of Navy civilian and contractor workplaces.  **State OSH officials must not be granted access aboard naval ships and service craft or in areas of exclusive federal jurisdiction.  A summary of inspector access is provided in appendix A3-A.**

(Emphasis added.)

Clearly, the imposition of laws and regulations other than those mandated by the Navy would potentially expose and the government and contractors to a series of laws and regulations from any one or more of the 50 states that might conflict with the mandates of the government and compromise the government's ability to govern and enforce its own contacts.  Accordingly, State law has no application to work performed by contractors aboard Navy ships.

24.    In the present case, NASSCO is a defense contractor.  For over 60 years, NASSCO operated a shipyard that included the construction and repair of United States Military vessels pursuant to stringent government specifications and

controls.  To the extent that the repair of such ships included asbestos-containing components, the United States Government approved reasonably precise specifications and regulations for work with such components.  The United States Government also approved reasonably precise specifications as to the existence and content of warnings and work practices associated with any such equipment.  Any decision regarding the treatment of asbestos in such equipment or the component parts thereof was under the full control and discretion of the United States Government.  *See Leite v. Crane Co.*, 479 F.3d 1117, 1123 (9th Cir. 2014).  The United States Government, likewise, controlled the content of written materials and warnings associated with such equipment.  Throughout its history, officers of the United States Military and other federal officers, were significantly involved in the acts providing the foundation for Plaintiff's state court claims against NASSCO - indeed, without the federal government having asked NASSCO to manufacture military equipment and build and/or repair its ships, Plaintiff would not have a claim against it.  Here, the requisite "causal nexus" between NASSCO's activities as a designer, manufacturer and repairer of military equipment pursuant to federal officer direction and control and the necessary "colorable federal defense" to Plaintiff's claims against it, exists.  This case is thus substantially similar to *Ballenger*, *Tate*, and numerous other cases that have addressed this issue.

25.     In support of this removal, NASSCO has submitted from a prior matter the Declaration of Admiral B. Roger Horne, Jr., which does not contain speculative or conclusory opinions, but are accurate attestations concerning the strict scrutiny by naval and other federal officers of all construction and/or repair work done by NASSCO for the federal government, including making decisions with regard to allowing warnings to be affixed on products aboard its ships.

26.     As explained by Admiral Horne, any and all work performed by NASSCO during the construction and/or repair of U.S. Navy and U.S. military vessels would have been performed to the requirements specified by naval or other

1  federal officers, including federal health and safety standards, and would have been

2  reviewed and inspected by Navy or other federal personnel.  (Bessette Decl.,

3  **Exhibit 5**, Horne Declaration, hereinafter "Horne Decl.", at ¶ 4, 3:23-25.)  Admiral

4  Horne later elaborated:

> During all aspects of NASSCO's work aboard Navy vessels,
> the U.S. Navy and government personnel would have exercised
> ultimate control of the vessels and of the work performed
> aboard them.  In the event of any unsafe work practices being
> performed by contractors aboard the vessels, Navy and
> government personnel had the authority and control to direct
> that the practices either be modified or stopped.  Similarly,
> during repair operations aboard the Navy vessels, ownership
> and custody of the ships, as well as the materials used for
> repairs and control of the work practices of contractors, vested
> in the U.S. Navy and government personnel.  In fact, the
> Commanding Officer of military ships never relinquished his
> duty and responsibility for safety of the ship and crew and
> adherence to federal health and safety standards during the
> shipyard repairs.

16  (**Exhibit 5,** Horne Decl., at ¶ 5 c), 4:26-28, 5:1-8.)

17      27.    As noted in Admiral Horne's declaration, military specifications

18  ("MilSpecs") for the manufacture of equipment and construction and repair of

19  military vessels built for the Navy until the late-1960s and early-1970s mandated

20  the use of asbestos or asbestos-containing equipment in the design, manufacture

21  and repair of  vessels, and shipyards, equipment manufacturers, Naval Machinery

22  Inspectors and others relied on the MilSpecs to ensure strict compliance with the

23  Navy's demands and requirements for combat-ready vessels. (**Exhibit 5,** Horne

24  Decl., at ¶ 7, 6:19-28, 7:1-10.)  As is further stated in Admiral Horne's declaration,

25  the Navy not only prepared equipment, ship construction and repair specifications,

26  but also stationed Naval Machinery Inspectors at shipyards like NASSCO to assure

27  that Naval contractors followed the required specifications.  (**Exhibit 5,** Horne

28  Decl., at ¶ 9, 7:25-28, 8:1.).)

28.     Further, all private contractors, such as NASSCO, performed their work pursuant to precise requirements imposed by the U.S. Navy and under the U.S. Navy's detailed supervision and control:

> All private contractors, such as NASSCO, performed their work pursuant to precise requirements imposed by the U.S. Navy and under the U.S. Navy's detailed supervision and control.  For work aboard U.S. Navy vessels, the Navy dictated every aspect of the design, manufacture, installation, overhaul, repair, written documentation, safety conditions and warnings associated with its ships...and did not permit deviations from its contractors. Any changes to the specifications for work aboard naval vessels had to be approved by the Supervisor of Shipbuilding (SUSHIP) and the Chief of the Bureau of Ships (BUSHIPS ) (which later became NAVSEA) ....

> The U.S. Navy adheres to strict protocols for work by civilian contractors aboard naval ships and those protocols include the setting and enforcement of federal health and safety standards. For the drafting of those protocols, the Navy has been granted the power to exercise unrestricted discretion in military matters in order to insure the government's role as the defender of the country. In 1971, in an exercise of his authority and discretion, the Commander, Naval Ship Systems Command adopted regulations and controls relating to the removal and handling of asbestos-containing products.  The regulations contained various measures, including the posting of suggested signage aboard vessels. To the extent the signage recommended by the U.S. Navy did not rise to the level of warning as may have been mandated by State law, the U.S. Navy language would have prevailed, absent a directive from the U.S. Navy.

> In summary, … I can attest that shipyards, such as NASSCO, were required to fully comply with all contracts, plans and specifications the U.S. Navy set forth in the construction, maintenance and repairs of its vessels. It has been the standard policy of the U.S. Navy that no military vessels would be accepted by the U.S. Navy from a private repair yard without strict compliance from the contractor of all requirements, including specified health and safety standards.  U.S. Navy specifications controlled all aspects of work performed aboard

naval ships and naval personnel had final approval of technical and engineering materials, operating manuals, and hazard information. In my opinion, the U.S. Navy determined the nature of hazards aboard ships and had control over precautionary labeling and signage about the use of said products aboard its ships.  Further, in my experience, it is my opinion that no private contractor could have affixed a written warning anywhere aboard an active-duty U.S. Navy warship, advising of the risk of asbestos exposure, except by permission and direction of the U.S. Navy.

(**Exhibit 5**, Horne Declaration, at ¶¶ 14, 15 and 18.)

29.     In addition, among the requirements imposed on private contractors by the U.S. Navy was the use of asbestos-containing materials in the construction, maintenance and repair of naval vessels. This requirement reflected the state of the art at the time, as well as the demands and requirements of combat ready U.S. Navy vessels.  As noted by Admiral Horne:

U.S. Navy combat ships are complex and are intended to operate in war time environments. The U.S. Navy relied on the use of literally tons of asbestos on its destroyers and other warships. The U.S. Navy determined that asbestos was lighter in weight than other known insulating materials, thereby allowing ships to carry greater amounts of armaments and travel with greater speed and less fuel, was water resistant, less corrosive and provided the better protection against fire, smoke inhalation, and the tremendous temperatures generated on board naval vessels than other known materials. During World War II, the Korean conflict and thereafter, the use of asbestos directly increased the survivability of our naval forces and the chances for ultimate success against our nation's enemies.

Most naval warships contained between 22 tons of asbestos insulation for a destroyer and over 200 tons of asbestos insulation for an aircraft carrier. Fire was one of the biggest concerns on combat ships and could lead to great loss of sailors' lives. During World War II, the U.S. Navy had a tremendous problem in that United States ships were being sunk about as fast as the U.S. Navy could build them. Because of its superior qualities as an insulate, relative light weight, fire and water

resistant qualities, and because it doesn't produce smoke, asbestos was used throughout all combat vessels, including in the propulsion plants, fire and engine rooms, wherever the many miles of piping were located, and in the hull, bathrooms and sleeping quarters. Without its insulate qualities, tremendous temperatures would have made working with the boilers, pumps, turbines and generators and generally in the fire and engine rooms impossible. The U.S. Navy had determined that there was no viable substitute for asbestos until beginning around the late 1960's - early 1970's. The presence of asbestos on combat ships during World War II likely saved thousands of lives of U.S. personnel.

By way of example, in World War II the first major sea battle after Pearl Harbor was the Battle of the Coral Sea. The American aircraft carrier, Yorktown, was so badly damaged that the Japanese thought it had been sunk. The Yorktown limped back to Pearl Harbor for repairs. It was thought those repairs would take several months.  Instead, the Yorktown was ordered to leave Pearl Harbor within 48 hours so that it could participate in the Battle of Midway.

The Battle of Midway was a tremendous victory for the American forces and is considered by historians to be the turning point in the Pacific War in World War II. The presence of the American aircraft carrier, Yorktown, was instrumental in achieving that American victory. Based upon my experience as set forth in this Affidavit, I believe that the protection against fire provided by the asbestos on the Yorktown was a key factor in its surviving the Battle of the Coral Sea and subsequently participating in the Battle of Midway.

This is but one example why the U.S. Navy determined that asbestos was an indispensable material to be used in the construction of Navy ships, in spite of its knowledge of the potential hazards accompanying its use.

(**Exhibit 5**, Horne Declaration, at ¶ 11.)

      30.     Further, Admiral Horne attests, the Navy had superior knowledge of the dangers of asbestos prior to and during the time that NASSCO provided work aboard "military equipment," and would not have allowed any warnings to be

affixed to its equipment:

> Based on my review of reports created by the Maritime
> Commission and the U.S. Navy from the 1930's and 1940's,
> which included medical surveys and studies of U.S. Navy
> personnel, the Navy was aware, at least by the 1930's, of the
> potential for serious health hazards from exposure to asbestos.
> In my opinion, the U.S. Navy's knowledge of the medical
> effects of long-term exposure to asbestos was state-of-the-art.
> The U.S. Navy had access to medical studies and surveys of the
> long-term effects of exposure to asbestos and participated in the
> health inspections in the 30's identifying asbestos as a problem
> under certain circumstances.  Notwithstanding knowledge of
> the serious potential health hazards of exposure to asbestos, the
> U.S. Navy consistently maintained the policy of neither
> permitting written warning labels to be affixed to asbestos
> insulation or on asbestos-containing equipment installed on its
> naval vessels nor permitting manufacturers and suppliers of
> asbestos insulation or asbestos-containing equipment to
> transmit written or other warnings to naval personnel. This
> remained to be the U.S. Navy's policy even after the U.S.
> Navy's knowledge advanced during the 1960's to include the
> recognition that exposure to asbestos could cause cancer. After
> this time, the U.S. Navy established control practices during the
> removal and handling of new asbestos insulation, but the U.S.
> Navy   continued its practice of not placing warnings regarding
> the health hazards of asbestos on pumps and valves or the miles
> of insulated pipe on board its warships through the 1980's and
> beyond.
>
> With respect to constructors of naval vessels, even after a link
> between asbestos exposure and cancer became known, the U.S.
> Navy would have refused any request for a vessel builder or
> repairer, such as NASSCO, to affix warnings about asbestos,
> include them in any manuals, or transmit them to naval
> personnel. If any vessel constructor, equipment manufacturer or
> supplier would have written or otherwise reported to the U.S.
> Navy that the product it or some other manufacturer or supplier
> provided the U.S. Navy could or would cause health problems
> or hazards, it would have been Navy practice and procedure to
> direct such warning or advice to the U.S. Navy's Bureau of
> Medicine. It was the Bureau of Medicine's teams of physicians

who had the expertise over materials which could or would affect the health of Navy personnel. The surveys and studies conducted on U.S. Navy personnel in the 1930's and 1940's regarding the effects of exposure to asbestos dust which I've reviewed were conducted by the U.S. Navy's Bureau of Medicine.

(**Exhibit 5**, Horne Decl., at ¶¶ 12 and 13.)

31. In further support of the removal, NASSCO provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. (See Affidavit of Admiral Lehman, dated October 6, 2004, **Exhibit 5,** Horne Decl., at Exhibit A.) Admiral Lehman joined the U.S. Navy in 1942, and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the Alameda Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in Alameda from 1952 to 1054. (**Exhibit 5,** Horne Decl., Exhibit A at ¶ 1.) During his tenure in the U.S. Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment overhauls at the Brooklyn Navy Yard. (**Exhibit 5,** Horne Decl., Exhibit A, at ¶ 3.)

32. Admiral Lehman states in his Affidavit that the U.S. Navy controlled every aspect of the design and manufacture of equipment intended for installation on U.S. Navy vessels and that the U.S. Navy could not – and did not – permit its contractors to implement changes from military specifications. (**Exhibit 5,** Horne Decl., Exhibit A, at ¶¶ 2, 3.) He further states:

In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to

instructions and warnings on every piece of equipment.

Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment.  The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

(**Exhibit 5**, Horne Decl., Exhibit A, at ¶ 5.)

33.    Finally, the U.S. Navy would not have allowed its vessel constructors and repairers, such as NASSCO, to affix any warnings related to any asbestos hazards on their equipment, including its boilers or in their technical and operations manuals. As noted by Admiral Horne:

A shipyard such as NASSCO would have no control and would not have been permitted (either under the military specifications or, as a matter of U.S. Navy practice) to include a warning or cautionary statement not required by the U.S. Navy, including any statements related to asbestos.  Any attempt by NASSCO to include a cautionary statement concerning asbestos in a technical or instruction manual would have been futile as it would have been rejected by the U.S. Navy as contrary to MilSpecs. A shipyard such as NASSCO would not have been permitted (either under the specifications, or, as a matter of U.S. Navy practice) to attach any type of warning or cautionary statement, or include information in any manual, not required by the U.S. Navy, including any statements related to asbestos. As there were hundreds of pieces of equipment on board, the U.S. Navy would not permit warnings to be affixed on hundreds of pieces of equipment and miles of insulated pipe.

(**Exhibit 5**, Horne Decl., at ¶16.)

**34.**    Through the declarations of Admiral Horne and Admiral Lehman,

NASSCO has established that the U.S. Navy exercised significant discretion regarding asbestos warnings and the instructions and supervision given to its equipment manufacturers and shipyard contractors. Further, the U.S. Navy had superior knowledge of the hazards of asbestos, far beyond any information that NASSCO could ever have provided. And, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships, and did not permit deviations from any of its contractors, including NASSCO.

35.     For all the reasons set forth above, the "government contractor" defense has been colorably established by NASSCO in this case for its work as a ship constructor and repair contractor for work aboard the *USS Duluth (LPD-6)*, and federal removal jurisdiction under 28 U.S.C. § 1442(a)(l) has been properly and timely invoked.  *See Ballenger, supra*, 2007 WL 1813821; *Wright v. A.W. Chesterton, et al.*, C07-05403 MJJ (N.D. Cal. Feb.21, 2008); *Nelson v. Alfa Laval, et al.*, CV07-8338 VBF(RCx) (C.D. Cal. Feb. 8, 2008); see also *Fink v. Todd Shipyards*, No. 04-430, 2004 U.S. Dist. LEXIS 6912 (E.D. La. Apr. 20, 2004); *Delancey v. General Electric*, No. 04-431(E.D. La. filed Mar. 31, 2004); *Chicano v. General Electric Co.*, No. 03-5126 (E.D. Pa. filed Apr. 6, 2004); *Mitchell v. AC&S* , No. 04-2713 (E.D. VA filed Dec. 15, 2004); *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3rd Cir. 1998); *Crocker v. Borden, Inc.*, 852 F. Supp. 1322, 1327 (E.D. La. 1994); *Pack v. AC and S, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993).

36.     A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand.  28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(l).  *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

37.     As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon NASSCO are being filed with this Notice of Removal.

## Additional Grounds for Removal

38.     Plaintiff's Complaint also includes claims that give rise to additional federal affirmative defenses that trigger removal jurisdiction under 28 U.S.C. § 1442(a)(1).

## Derivative Sovereign Immunity, *Yearsley* Defense

28.     First, NASSCO is entitled to federal officer removal under 28 U.S.C. § 1442(a)(1) based upon the independent and additional federal defense of derivative sovereign immunity, otherwise known as the *Yearsley* defense.  That defense is similar to the government contractor defense in that it provides that a defendant who performs services or provides products in compliance with contract specifications and other requirements imposed by the United States Government or its agencies enjoys derivative sovereign immunity from all claims arising or alleged to arise therefrom.  *See Yearsley v. W.A. Ross Constr. Co.* (1940) 309 U.S. 18; *Campbell-Ewald Co. v. Gomez* (2016) 577 U.S. ___, 136 S.Ct. 663.  "[U]nder *Yearsley*, a government contractor is not subject to suit if (1) the government authorized the contractor's action; and (2) the government 'validly conferred that authorization, meaning it acted within its constitutional power." *In re KBR, Inc.*, 744 F3d 326, 342 (4th Cir. 2014) (citing *Yearsley*, 309 U.S. at 20-21).  The *Yearsley* doctrine is satisfied here because the acts complained of were performed at the direction of government officers, namely the United States military, acting pursuant to government authorization, and if the government had performed these acts directly, it would be immune from suit.

29.     The Supreme Court recently clarified the scope of the *Yearsley* derivative immunity in its decision in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).  The Court confirmed that the *Yearsley* immunity defense applies

NATIONAL STEEL AND SHIPBUILDING'S NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §§ 1442(a)(1)

outside of the public works context so long as the contractor can demonstrate that it complied with the government's specifications without regard to the subject matter of the contract.  *Id* at 673.

The *Campbell-Ewald* Court stated:

> We disagree with the Court of Appeals to the extent that it described Yearsley as "establish[ing] a narrow rule regarding claims arising out of property damage caused by public works projects."  768 F.3d. at 879.  Critical in Yearsley was not the involvement of public works, but the contractor's performance in compliance with all federal directions.

*Id.* at 673 n.7.

30.     In *Campbell-Ewald*, the defendant service contractor, a global advertising agency that contracted with the Navy to support its recruiting efforts, relied only on the *Yearsley* immunity defense at the district level and made no mention of *Boyle*.  Plaintiff's argument that defendant had to satisfy the *Boyle* analysis was expressly rejected by the court on summary judgment.  *See Gomez v. Campbell-Ewald Co*., 2013 U.S. Dist. LEXIS 34346, 2013 WL 655237, at *5 (C.D. Cal. Feb. 22, 2013), vacated, 768 F.3d 871 (9th Cir. 2014), affd., 136 S. Ct. 663(2016). The defendant prevailed on *Yearsley* grounds because the Navy contracted with the defendant to obtain advertising-related services, and the defendant acted at the Navy's direction pursuant to those contracts.  *Id.*  The Court further found that the Navy worked closely with defendant on the offending text message recruiting campaign, providing oversight and approval, and reviewed, revised, and approved the text message itself.  *Id.* at *6.

31.     In a recent case, the Fourth Circuit rejected an attempt to limit the scope of the *Yearsley* doctrine finding that nothing indicated that the United States Supreme Court intended to limit its holding to claims arising under state law.  *Cunningham v. General Dynamics Info. Tech.*, 888 F.3d 640,646 (4th Cir. 2018); *see also*, *Campbell-Ewald*, 136 S. Ct. at 672-73 (reaffirming the basic requirements

of *Yearsley* applicability without implying that its grant of immunity was limited to state law liability and concluding that *Yearsley* may immunize violations of the TCPA); *Tozer v. LTV Corp.*, 792 F.2d 403. 405 (4th Cir. 1986), cert. denied, 487 U.S. 1233 (1988) (concluding that a military contractor could assert a *Yearsley* defense to a federal cause of action).

32.    NASSCO is entitled to the derivative sovereign immunity defense because, as noted above, it is a government contractor who performed the construction and repair of military ships pursuant to contracts with the U.S. government whereby it was charged with the duty to execute the mission by designing, building and repairing ships and any work would have been in furtherance of stringent government standards, specifications and controls. Accordingly, NASSCO has established its entitlement to removal under *Yearsley*.

## III.    CONCLUSION

35.    Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(l) because NASSCO was acting under an officer or agency of the United States.

36.    Therefore, NASSCO, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, files this Notice of Removal of this action for trial from the Superior Court of the State of California, County of Los Angeles.

Dated:  February 17, 2023          DEMLER, ARMSTRONG & ROWLAND, LLP

By: _____
     P.M. Bessette
     Attorneys for Defendant NATIONAL STEEL
     AND SHIPBUILDING COMPANY

1

## **CERTIFICATE OF SERVICE**

2

3
        I am employed in the County of San Francisco, State of California.  I am
over the age of 18 and not a party to the within action; my business address is 101
Montgomery Street, Suite 1800, San Francisco, California 94104.

4

5
        On February 17, 2023, I served the foregoing document(s) described as
**NATIONAL STEEL AND SHIPBUILDING COMPANY'S NOTICE OF
REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. §§ 1442(a)(1)** on the
interested parties in this action addressed as follows:

6

7

8
TO ALL PARTIES
(*See CM/ECF Service List*)

9

10
☐       BY MAIL – I placed the document(s) listed above in a sealed envelope and
place the envelope for collection and mailing on the date below following the

11
firm's ordinary business practice.  I am readily familiar with the firm's practice of
collection and processing for mailing. Under that practice it would be deposited

12
with the U.S. Postal Service on the same day with postage thereon fully prepaid in
San Francisco, California, in the ordinary course of business.  I am aware that on

13
motion of the party served, service is presumed invalid if postal cancellation date
or postage meter date is more than one day after date of deposit for mailing in

14
affidavit.

15
☐       BY PERSONAL SERVICE – I caused personal delivery of the document(s)
listed above to the person(s) at the address(es) set forth above.

16

17
☐       BY FACSIMILE TRANSMISSION – I transmitted via facsimile the
document(s) listed above to the fax number(s) set forth above on this date before

18
5:00 p.m.

19
☒       BY ELECTRONIC TRANSMISSION – I electronically served the above
document(s) via CM/ECF on the recipients designated on the Transaction Receipt

20
located on the CM/ECF website.

21
☐       BY FED EX – I placed the document(s) listed above in a sealed envelope

22
designated for Fed Ex overnight delivery and deposited the same with fees
thereupon prepaid, in a facility regularly maintained by Federal Express, addressed

23
as set forth above.

24
        I declare under penalty of perjury under the laws of the State of California

25
that the above is true and correct.  Executed on February 17, 2023, at San
Francisco, California.

26

27
_____
Margarita Bermudez

28

28

NATIONAL STEEL AND SHIPBUILDING'S NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C.
§§ 1442(a)(1)